Gideon Kracov (State Bar No. 179815)
LAW OFFICE OF GIDEON KRACOV
801 S. Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Tel: (213) 629-2071
Fax: (213) 623-7755
Email: gk@gideonlaw.net

Arthur Pugsley (State Bar No. 252200)
Melissa Kelly (State Bar No. 300817)
LOS ANGELES WATERKEEPER
120 Broadway, Suite 105
Santa Monica, CA 90401
Tel: (310) 394-6162
Fax: (310) 394-6178
Email: arthur@lawaterkeeper.org
Email: melissa@lawaterkeeper.org

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a non-profit corporation,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>PRESS FORGE COMPANY, a corporation, DOES 1 through 10,<br><br>　　　　Defendants. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

LOS ANGELES WATERKEEPER ("WATERKEEPER" or "Plaintiff"), a

California non-profit corporation, by and through its counsel, hereby alleges:

COMPLAINT                                            1

## I.  **INTRODUCTION**

1.  This complaint seeks relief for ongoing and continuous violations by Press Forge Company ("Defendant" or "PRESS") of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "Act") and the National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ and Order No. 2014-0057-DWQ ("Permit" or "General Permit") resulting from those industrial facilities owned and operated by PRESS at and/or near 7700 Jackson Street in Paramount, California ( collectively the "Facility").

2.  Millions of gallons of polluted storm water originating from industrial operations like those conducted at the Facility pour into storm drains and local waterways during every significant rainfall event. The consensus among agencies and water quality specialists is that this storm water pollution accounts for more than half of the total pollution entering surface waters each year.

3.  Los Angeles' waterways are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Los Angeles' waterways provide aesthetic opportunities, such as wildlife observation, and public uses including both water contact and non-contact recreation.

4.  Industrial facilities, like the Defendant's, that are discharging storm water

COMPLAINT                                                      2

and non-storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to such toxins, and harm the aesthetic and recreational significance Los Angeles' waterways have for residents of these communities and visitors alike.

## II.    JURISDICTION AND VENUE

5.    This is a civil suit brought under the citizen suit enforcement provisions of the Act.  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

6.    On January 17, 2017 WATERKEEPER issued a sixty (60) day "Notice of Violation and Intent to File Suit" letter ("Notice Letter") to PRESS, including its registered agent for service of process, for its violations of both substantive and procedural provisions of the Act and Permit.  The Notice Letter informed Defendant of Waterkeeper's intent to file suit against it to enforce the Act and Permit.

7.    The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and

COMPLAINT                                                    3

the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"), as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of the Notice Letter is attached as **Exhibit A**, and is incorporated by reference.

8.      More than sixty (60) days have passed since the Notice Letter was served on PRESS and the State and federal agencies.

9.      Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

10.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## III.  **PARTIES**

11.     Plaintiff is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 120 Broadway, Suite 105, Santa Monica, California 90401.

12.     Founded in 1993, WATERKEEPER is dedicated to the preservation, protection and defense of the inland and coastal surface and groundwaters of Los Angeles County. The organization works to achieve this goal through litigation and

COMPLAINT                                                        4

regulatory programs that ensure water quality protection for all waterways in Los Angeles County.  Where necessary to achieve its objectives, WATERKEEPER directly initiates enforcement actions under the Act on behalf of itself and its members.

13.    WATERKEEPER has approximately 3,000 members who live and/or recreate in and around the Los Angeles basin, including many who live and recreate along the Los Angeles River and connected waters.  WATERKEEPER members use and enjoy local waters and waterways to fish, surf, swim, sail, SCUBA dive, kayak, bird watch, view wildlife, hike, bike, walk, and run.  Additionally, WATERKEEPER's members use the waters to engage in scientific study through pollution and habitat monitoring, and restoration activities.

14.    The unlawful discharge of pollutants from the Facility into the Los Angeles River and downstream waters impairs the ability of WATERKEEPER members to use and enjoy these waters.  Thus, the interests of WATERKEEPER's members have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Clean Water Act and General Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant(s)' activities.

15.    Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

16.    Plaintiff alleges on information and belief that PRESS is an active

California corporation.

17.     The Notice of Intent to Comply With the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") was filed by PRESS on June 22, 2015 ("2015 NOI").[1]

18.     Upon information and belief, Plaintiff alleges that the true names, or capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names.  Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained.  Whether or not PRESS is associated with any other individual, corporate, associate or otherwise was not immediately apparent through an initial investigation completed by Plaintiff.

19.     PRESS and DOES 1 through 10 are referred to collectively throughout this Complaint as Defendant or Defendants.

## IV.   **LEGAL BACKGROUND**

### A.     **The Clean Water Act.**

20.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of

---

[1] PRESS lists 7700 Jackson Street in Paramount as the company and facility address on all NPDES and Secretary of State filings with the State of California.  However, the company's industrial activities occur at various facilities at/near this address, including but not limited to, 16421 and 16443 Illinois Avenue, Paramount.  Waterkeeper will add more accurate descriptions of industrial facilities covered by the permit issued to Press as additional information becomes available.

any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the statute. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of NPDES permits issued pursuant to section 402 of the Act, 33 U.S.C. §§ 1311(a) and 1342(b). The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

21.   "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

22.   The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

23.   The Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

24.   A significant nexus is established if the water in question "either alone or in combination with similarly situated lands in the region, significantly affect the

chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 780; *N. Cal. River Watch*, 496 F.3d at 999-1000.

25.    Section 505(a)(1) of the Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation…or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

26.    Defendant PRESS is a "person" within the meaning of section 502(5) of the Act. *See* 33 U.S.C. § 1362(5).

27.    An action for injunctive relief is authorized under section 505(a) of the Act. *See* 33 U.S.C. § 1365(a)(1).

28.    Each separate violation of the Act subjects the violator to a penalty of up to $51,570 per day for violations occurring after November 2, 2015; and up to $37,500 per day per violation for violations occurring prior to and including November 2, 2015. *See* 33. U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

29.    Section 505(d) of the Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. *See* 33 U.S.C. § 1365(d).

**B.    California's Storm Water Permit.**

30.    The State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

31.     Section 402(p) of the Act establishes a framework for regulating industrial storm water discharge under the NPDES permit program. 33 U.S.C. § 1342(p).

32.     Section 402(b) of the Act allows each state to administer an EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b).

33.     States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to discharge and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water discharges. *See* 33 U.S.C. § 1342(b).

34.     California is a state authorized by EPA to issue NPDES permits. The Permit is a statewide general NPDES permit issued by the State Board pursuant to the Act.

35.     Between 1997 and June 30, 2015, the Permit in effect in California was Order No. 97-03-DWQ, which WATERKEEPER refers to herein as the "1997 Permit."

36.     On July 1, 2015, California re-issued the Permit pursuant to Order No. 2014-0057-DWQ's NPDES, which is referred to herein as the "2015 Permit."

37.     The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more so, than the terms of the 1997 Permit. *See* 2015 Permit, Findings, ¶ 6.

COMPLAINT

38.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Permit and comply with its terms, or obtain and comply with an individual NPDES permit.  1997 Permit, Finding #2; 2015 Permit, Findings, ¶ 12.  Prior to beginning industrial operations, dischargers are required to apply for coverage under the Permit by submitting a NOI to the State Board. 1997 Permit, Finding #3; 2015 Permit, Findings, ¶ 17.

39.    Compliance with the Permit constitutes compliance with the Act for purposes of storm water discharges.  33. U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E).  Conversely, violations of the Permit are violations of the Act. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

**C.    The Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

40.    The Permit contains a Discharge Prohibition on the direct or indirect discharge of materials other than storm water ("non-storm water discharges") that is not otherwise authorized by an NPDES permit to waters of the United States. 1997 Permit, Section A(1); 2015 Permit, Section III(B).

41.    The Permit contains an Effluent Limitation that requires permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  40 C.F.R. §§ 401.15-16; 1997

COMPLAINT

Permit, Section B(3); 2015 Permit, Section V(A).  BAT and BCT include both structural (e.g. installation of curbs to direct storm water flows) and non-structural (e.g. sweeping) measures.

42.     In order to comply with the statutory BAT/BCT mandate, covered facilities must implement site-specific structural and non-structural Best Management Practices ("BMPs") designed to prevent or reduce discharges with pollutant concentrations that violate the Permit, and therefore the Act.

43.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") include numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks") that are numeric thresholds to aid in determining whether a facility discharging industrial storm water had implemented the requisite BAT and/or BCT as mandated by the Act.  *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, as modified effective May 9, 2009.

44.     EPA's Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a facility achieve the statutory BAT/BCT standards.  *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); *see also* MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

45.     The State Board established Numeric Action Levels ("NALs") in the 2015 Permit.  *See* 2015 Permit, Section V(A).  NALs are derived from, and function

COMPLAINT                                                            11

similar to, EPA benchmarks. *See* 2015 Permit Fact Sheet, Section I(D)(5).

Benchmarks and NALs represent pollutant concentrations at which a storm water discharge could impair, or contribute to impairing, water quality and/or affect human health.

46.     The Permit also contains various Receiving Water Limitations. 1997 Permit, Receiving Water Limitation C(1)-(2); 2015 Permit, Section VI(A). Receiving Waters are those surface or other waters to which pollutants are discharged from a given facility.

47.     The first Receiving Water Limitation is that stormwater discharges shall not cause or contribute to an exceedance of any applicable water quality standard ("WQS"). *Id.*

48.     WQS are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the water that receive polluted discharges. WQS applicable to the discharges covered by the Permit include, but are not limited to, those set out in the *Water Quality Control Plan, Los Angeles Basin (Basin Plan for the Coastal Watersheds for Los Angeles and Ventura Counties)*, California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended) ("Basin Plan") and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

49.     The second Receiving Water Limitation is that storm water discharges shall not adversely impact human health or the environment. 1997 Permit, Receiving

Water Limitation C(1); 2015 Permit, Section VI(B).

50.     The third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. *See* 2015 Permit, Section VI(C).

51.     The Facility violates the Permit's Receiving Water Limitation when its storm water discharges contain pollutant levels that: i) exceed an applicable WQS; ii) exceed levels known to adversely impact aquatic species and the environment; or iii) threaten to cause pollution.

52.     The Facility's stormwater discharges drain from Reach 2 of the Los Angeles River ("River"), through Reach 1 of the River, the Los Angeles River Estuary, the Los Angeles/Long Beach Harbor, and the San Pedro Bay to the Pacific Ocean via (collectively "Receiving Waters").  The Regional Board identifies beneficial uses of the Receiving Waters and establishes water quality standards in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties*[2] (adopted June 13, 1994, as amended) ("Basin Plan").  The beneficial uses of the Receiving Waters include municipal and domestic water supply, groundwater recharge, water contact recreation,[3] non-contact water recreation,[4] warm freshwater habitat, wildlife habitat,

---

[2] *Available at* http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/.
[3] Contact recreation use includes fishing and wading.  Basin Plan at 2-2.
[4] Non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting,

COMPLAINT                                                        13

wetland habitat, marine habitat, rare, threatened, or endangered species, preservation of biological habitats, migration of aquatic organisms, spawning, reproduction and/or early development, and shellfish harvesting.

53.    The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life." Basin Plan at 3-38. The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." Basin Plan at 3-29. The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-37. The Basic Plan provides that "[t]he pH of inland surface waters shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges." Basin Plan at 3-35. The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use." Basin Plan at 3-24. The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause

sightseeing, or aesthetic enjoyment in conjunction with the above activities." Basin Plan at 2-2.

nuisance or adversely affect beneficial uses." Basin Plan at 3-26. The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses." Basin Plan at 3-25. The Basin Plan provides that "[w]aters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-38. The Basin Plan provides that "[w]aters shall not contain taste or odor-producing substances in concentrations that impart undesirable tastes or odors to fish flesh or other edible aquatic resources, cause nuisance, or adversely affect beneficial uses." Basin Plan at 3-37.

54.     The U.S. EPA has adopted freshwater numeric water quality standards for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC"), for copper of 0.013 mg/L (CMC), and for lead of 0.0025 mg/L (Criteria Continuous Concentration – "CCC"). 65 Fed. Reg. 31712 (May 18, 2000) (California Toxics Rule – "CTR").[5]

55.     According to the 2012 303(d) List of Impaired Water Bodies,[6] Reaches 1 and 2 of the Los Angeles River are impaired by pollutants such as pH, cyanide, diazinon, lead, nutrients, ammonia, cadmium, coliform bacteria, copper, trash, zinc, and oil. The Los Angeles River Estuary is impaired by, among other pollutants, chlordane, sediment toxicity, and trash.[7] The Los Angeles/Long Beach Harbor is impaired by at least chrysene, copper, sediment toxicity, mercury, and zinc.[8] The San

---

[5] These values are expressed as a function of total hardness (mg/L) in the water body and correspond to a total hardness of 100 mg/L, which is the default listing in the California Toxics Rule.
[6] *Available at* http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml
[7] *Id.*
[8] *Id.*

COMPLAINT                                                    15

Pedro Bay is impaired by sediment toxicity, and the Long Beach City Beach, one of the San Pedro Bay beaches, is impaired by indicator bacteria.[9]

56.    The Receiving Waters are ecologically significant.  Although pollution and habitat destruction have drastically altered the natural ecosystem, the Receiving Waters are still essential habitat for dozens of fish and bird species, as well as macro-invertebrate and invertebrate species.  Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance the Receiving Waters have for people in surrounding communities, including WATERKEEPER members. The public's use of the Receiving Waters for water contact sports and fishing exposes many people to toxic metals, pathogens, bacteria and other contaminants in storm water and non-storm water discharges.  Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

57.    Discharges of pollutants at levels above WQS contribute to the impairment of the beneficial uses of the waters receiving the discharges and constitute violations of the Permit and Act.

58.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of the Permit's Receiving

_____

[9] *Id.*

COMPLAINT

16

Water Limitations.

59.    WQS applicable to the Facility include, but may not be limited to, those detailed in TABLE 1. Benchmarks and/or NALs established for conventional and industry specific pollutants discharged from the Facility, and for which PRESS must analyze samples, are summarized below at TABLE 1.

### TABLE 1
BENCHMARK AND NAL VALUES APPLICABLE TO THE PRESS FACILITY

| PARAMETER/ POLLUTANT | EPA BENCHMARK | ANNUAL NAL | INSTANTANEOUS MAXIMUM NAL |
|---|---|---|---|
| pH | 6.0-9.0 s.u. | n/a | 6.0-9.0 s.u. |
| TSS | 100 mg/L | 100 mg/L | 400 mg/L |
| O&G | 15 mg/L | 15 mg/L | 25 mg/L |
| SC | 200 uhmos/cm | 200 uhmos/cm | n/a |
| TOC | 110 mg/L | 110 mg/L | n/a |
| COD | 120 mg/L | 120 mg/L | n/a |
| Al | 0.75 mg/L | 0.75 mg/L | n/a |
| N+N | 0.68 mg/L | 0.68 mg/L | n/a |
| Fe | 1.0 mg/L | 1.0 mg/L | n/a |
| Zn | 0.117 mg/L | 0.26 mg/L | n/a |
| Cu | 0.0332 mg/L | 0.0332 mg/L | n/a |

**D.    The Permit's Planning and BMP Design Requirements.**

60.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit,

Sections A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54) and X(B).

61.   The SWPPP must identify and evaluate sources of pollution associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility.  1997 Permit, Section A(2); 2015 Permit, Section X(G).

62.   The SWPPP must identify and describe site-specific BMPs to reduce or prevent pollutants associated with industrial activity in storm water and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must also include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

63.   The SWPPP must include: i) a narrative description and summary of all industrial activity, potential sources of pollution, and potential pollutants; ii) a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; iii) a description of storm water management practices; iv) a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; v) the identification and elimination of non-storm water discharges; vi) identify and locate where materials are being shipped, received, stored, handled, as well as typical quantities of such materials and the

frequency with which they are handled; vii) a description of dust and particulate generating activities; and viii) a description of individuals and their current responsibility for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

64.     The 2015 Permit further requires certain SWPPP enhancements, including a more comprehensive assessment of potential pollutant sources and more specific BMP descriptions.  *See* 2015 Permit Sections X(G)(2), (4), (5).

65.     The objectives of the SWPPP are to identify and evaluate source of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify, design and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities.  1997 Permit, Section A(2); 2015 Permit, Section X.

66.     The objectives of the requirement to develop, maintain and revise a SWPPP are to identify pollutant sources and develop BMPs that reduce or prevent polluted storm water from negatively affecting Receiving Waters and California communities.  *See* 1997 Permit Section A(2); *see also* 2015 Permit Section X(C). BMPs must achieve compliance with the Permit's Effluent Limitations and Receiving Water Limitations.  To ensure compliance, the SWPPP must be evaluated and revised as necessary.  *See* 1997 Permit Sections A(9)-(10); *see also* 2015 Permit § X(B). Failure to develop or implement an adequate SWPPP (or revise an existing SWPPP,

as necessary) constitutes an independent Permit violation.  *See* 2015 Permit, Fact Sheet, Section I(1).

67.    The Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling analysis data, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and/or maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP.  1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

68.    Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification or personnel performing the evaluation, date(s) of the evaluation(s) necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Permit. 1997 Permit; Section A(9)(d)(i)-(vi).  If certification cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance. *Id.*, Section A(9)(d).  The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Permit. *Id.*

### E.    The Permit's Monitoring and Reporting Requirements

69.    The 1997 Permit required facility operators to develop and implement a

monitoring and reporting program ("M&RP") when industrial activities begin at the facility. 1997 Permit, Sections B(1)-(2) and E(3).  The 2015 Permit also requires implementation of an M&RP.  2015 Permit, Sections X(I) and XI.

70.     The objectives of the M&RP are to inform dischargers about the effectiveness of BMPs designed in the planning phase and implemented on the ground.  Where the M&RP indicates that BMPs are not adequate to prevent or reduce pollutants in storm water discharges, permittees have an obligation to re-design BMPs and/or improve BMP implementation as necessary to ensure that storm water discharges are in compliance with the Permit's Discharge Prohibitions, Effluent Limitations and Receiving Water Limitations.  *See* 1997 Permit, Section B(2); *see also* 2015 Permit, Sections X(I) and XI.

71.     The 2015 Permit requires facility operators to visually observe, monitor and sample storm water discharges to ensure that the facility is complying with its obligations under the Permit.  2015 Permit, Sections I(J) (Findings 55-56) and XI.

72.     The M&RP must be revised as necessary to ensure Permit compliance. 1997 Permit, Section B(2)(d); 2015 Permit, Section XI(A)(4).

73.     Discharges must conduct monthly visual observations of storm water discharges as part of a legally adequate M&RP.  1997 Permit, Section B(4)(a); 2015 Permit, Section XI(A).

74.     Dischargers must observe and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in a discharge,

and the source of any pollutants in storm water discharges from the facility.

75.   Dischargers are required to maintain detailed records of each observation, and corrective action taken to reduce or prevent pollutant from contacting storm water discharges.  *See* 1997 Permit, Section B(4)(c); *see also* 2015 Permit, Section XI(A)(3).

76.   The Permit requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants from entering surface waters from the facility.  1997 Permit, Section B(4)(c), 2015 Permit, Section XI(B)(1).

77.   The Permit requires dischargers to visually observe and collect samples of storm water discharges from each location where storm water is discharged.  1997 Permit, Sections B(5) and B(7); 2015 Permit, Section XI(B)(4).

78.   Section B(5)(a) of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

79.   Section B(5)(b) required that sampling conducted pursuant to the 1997 Permit occur during scheduled facility operating hours that are preceded by at least

three (3) working days without storm water discharge.

80.    Section XI(B)(1) of the 2015 Permit requires sampling from a Qualifying Storm Event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

81.    Dischargers are required to collect samples of storm water within 4 hours of the start of facility operations if the QSE began within the previous 12-hour period, e.g. for storms with discharges that begin during the night for facilities with day-time operations. 2015 Permit, Section XI(B)(5)(b).

82.    Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

83.    Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within thirty (30) days of obtaining all results for each sampling event.

84.    The Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and either total organic carbon ("TOC") or Oil & Grease ("O&G").  1997 Permit, Section B(5)(c)(i); 2015 Permit, Sections XI(B)(6)(a)-(b).

85.    PRESS' Regional Board filings contain contradictory information

regarding the Facility's Standard Industrial Classification ("SIC").   Annual Reports for 2011-2012 and 2012-2013 list the Facility's SIC as 3599 ("Industrial and Commercial Machinery and Equipment, Not Elsewhere Classified"), while other filings indicate the Facility's SIC is 3463 ("Nonferrous Forgings").  Facilities classified as SIC code 3463 ("Nonferrous Forgings") must also analyze storm water samples for aluminum ("Al"), Iron ("Fe"), Nitrate + Nitrite Nitrogen ("N+N") and zinc ("Zn"). 1997 Permit, Section B(5)(c)(iii) and Table D; 2015 Permit, Section XI(B)(6)(d) and Table 1.

86.    The Permit also requires dischargers to analyze each sample for site-specific toxic chemicals and other pollutants associated with the specific industrial operations at the facility.  1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(c).

87.    Section XI(B)(6) of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

88.    Section B(14) of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in

Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

89.    Section XVI of the 2015 requires dischargers to submit an Annual Report with a Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, an explanation for any noncompliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.    STATEMENT OF FACTS

### A.    The PRESS Facility.

90.    The NOI for on file with the Regional Board has issued Waste Discharger Identification No. 4 19I002338 for the Facility and certifies that the Facility covers 3 acres.

91.    According to the SWPPP dated June 22, 2016 on file with the Regional Board, the Facility covers approximately 9 acres.

92.    According to information available to WATERKEEPER, the Facility forges titanium and other metal billets to form oil field drilling parts and other metal forgings for industrial use.  The Facility's "outdoor industrial operations" routinely include: "[U]nload[ing] large ingots of titanium and other metals and stor[ing] them in the open yard. After inspection, they are brought inside and placed in high-

COMPLAINT                                              25

temperature ovens to soften the metal. They are removed with large industrial trucks using pincers and placed into a forge. The material is stamped, rotated, and shaped. This process continues in repetition. Several times during the forging, the metal part can also be heat treated by cooling. At some predetermined point, the forged metal is taken outdoors, or into another building to grind off oxidation. The metal is then pressed again, or quality checked and readied for shipment as a finished part."

93.   U.S. EPA's Industrial Storm Water Fact Sheet for AA: Fabricated Metal Products Manufacturing Facilities[10] indicates that polluted discharges from industrial activities like those conducted at the Facility commonly contain substances affecting pH; metals, such as iron, aluminum, and nickel; toxic metals, such as lead, zinc, cadmium, chromium, and copper; organics; chemical oxygen demand ("COD"); biological oxygen demand ("BOD"); total suspended solids ("TSS")[11]; fuel additives, gas/diesel fuel, oil and grease ("O&G"); coolants and solvents; acid/alkaline waste; and, trash and debris.  Similarly, EPA's Industrial Storm Water Fact Sheet for Sector AB: Transportation Equipment, Industrial, or Commercial Machinery Manufacturing Facilities[12] indicates that polluted discharges from industrial activities like those conducted at the Facility commonly contain TSS; O&G; organics; solvents;

---

[10] *Available at* https://www3.epa.gov/npdes/pubs/sector_aa_fabmetal.pdf
[11] High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS results in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.
[12] *Available at* https://www.epa.gov/sites/production/files/2015-10/documents/sector_ab_transport.pdf.

COMPLAINT                                                      26

acid/alkaline wastes; heavy metals; toxic metals such as lead, arsenic, cadmium, and chromium; COD; gasoline and diesel. Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and developmental or reproductive harm.  Discharges of polluted storm water to the local surface waters pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment.

**B.    The Facility's Discharges and Receiving Waters**

94.    The Facility is located approximately 1.36 miles east of the Los Angeles River. The SWPPP describes six drainages—identified and sampled as Areas 1, 2, 2a, 3, 4 and 5—from five industrial areas.  All stormwater discharges enter local storm drains operated by the County of Los Angeles and travel below grade to the River. Information available to WATERKEEPER indicates that the Facility includes no fewer than three forging building, five independent grinding operations, four cooling areas with quenching tanks, an outdoor oxidization coating structure, a penetrant dye and coating area, numerous maintenance, parts and waste storage structures as well as several parking lots.

95.    WATERKEEPER is informed and believes, and thereon alleges, that each of the Receiving Waters is a water of the United States.

96.    WATERKEEPER is informed, believes, and thereon alleges that the Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in the Receiving Waters. Elevated levels of metals,

COMPLAINT                                                27

nutrients, pathogens, and sediments have resulted in the inability of the Receiving Waters to support their beneficial uses.

97.     Although pollution and habitat destruction have drastically altered the natural ecosystem, the Receiving Waters are still essential habitat for dozens of fish and bird species, as well as macro-invertebrate and invertebrate species.

98.     On information and belief, WATERKEEPER alleges that storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance the Receiving Waters have for people in surrounding communities, including WATERKEEPER members.

99.     The public's use of the Receiving Waters for water contact sports and fishing exposes many people to toxic metals, pathogens, bacteria and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

C.     **Defendant's Specific Violations of Effluent Limitations, Receiving Water Limitations and Protections for Impaired Water Bodies**

100.   On information and belief, Plaintiff alleges that the Facility has failed and continues to fail to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve BAT/BCT as required by the Act and Permit

101.   **Effluent Limitations Violations.**  Information available to

WATERKEEPER indicates that the Facility has failed and continues to fail to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve BAT/BCT as required by the Act through the Permit. The Facility has a consistent pattern of significant exceedances of multiple parameters since at least 2009. In fact, according to information available to WATERKEEPER, the Facility has discharged polluted storm water in violation of the Permit's Effluent Limitations during every single rain event over the course of the last five years

102.   As noted above, Benchmarks are relevant and objective standards for evaluating whether a permitee's BMPs achieve compliance with BAT/BCT as required by the Permit's Effluent Limitations. The data summarized in TABLE 2 as reported to the Regional Board by PRESS establish that PRESS has discharged and continues to discharge pollutants well in excess of Benchmark values. Self-monitoring data reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

/ / /

## TABLE 2

### THE PRESS FACILITY'S ANALYTICAL RESULTS AS SUBMITTED TO THE STATE

| Date | Sample Point | Ph | TSS | O&G | SC | COD | Al | N+N | Fe | Zn | Cu |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 11.30.12 | North | 8.82 | 172* | 111 | 116 | not tested | not tested | not tested | 27.3 | not tested | not tested |
| 11.30.12 | South | 7.76 | 147 | 28.5 | 108 | 126 | not tested | not tested | 9.99 | not tested | not tested |
| 12.02.12 | North | 7.44 | 920 | 36.2 | 104 | not tested | 15.4 | not tested | 54.1 | 1.03 | 0.426 |
| 12.02.12 | South | 8.59 | 266 | 12.0 | 106 | not tested | 5.10 | not tested | 34.4 | 0.703 | 0.120 |
| 12.02.12 | Street | 7.82 | 216 | 9.75 | 139 | not tested | 5.32 | not tested | 12.3 | 0.416 | 0.135 |
| 01.24.13 | North | 2.15 | 841 | 115 | 4750 | 909 | not tested | not tested | 59.2 | 1.94 | not tested |
| 01.24.13 | South | 6.32 | 175 | 46.6 | 108 | 187 | not tested | not tested | 9.2 | 0.64 | not tested |
| 12.18.13 | unknwn | 6.5 | 172 | 41.7 | 346 | 396 | not tested | not tested | 27 | 0.7 | 0.2 |
| 5.14.15 | 1 | 6.56 | 74 | not tested | 84.2 | not tested | not tested | not tested | not tested | not tested | not tested |
| 5.14.15 | 2 | 6.51 | 183 | not tested | 347 | not tested | not tested | not tested | not tested | not tested | not tested |
| 5.14.15 | 3 | 6.79 | 66 | not tested | 80.1 | not tested | not tested | not tested | not tested | not tested | not tested |
| 5.14.15 | 4 | 6.53 | 48 | not | 117 | not | not tested | not | not | not | not tested |

| | | | | tested | | tested | | tested | tested | tested | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9.15.15 | North Press//2 | not tested | 139 | ND | not tested | not tested | 0.438 | 0.172 | 3.27 | 1.36 | not tested |
| 9.15.15 | South Press//1 | not tested | 29 | ND | not tested | not tested | 0.412 | 0.383 | 1.22 | 0.459 | not tested |
| 12.11.15 | 1 | 8 | 57 | ND | not tested | not tested | 0.99 | 6.35 | 3.39 | 0.549 | not tested |
| 12.11.15 | 2 | 6.5 | 197 | ND | not tested | not tested | 9.93 | 1.03 | 11.7 | 1.13 | not tested |
| 12.11.15 | 3 | 6.5 | 27 | 1 | not tested | not tested | 3.04 | 3.17 | 2.22 | 0.984 | not tested |
| 12.11.15 | 4 | 6.5 | 48 | ND | not tested | not tested | 2.83 | 3.64 | 1.32 | 0.352 | not tested |
| 12.11.15 | 5 | 6.25 | 34 | 1 | not tested | not tested | 1.3 | 3.54 | 1.36 | 0.611 | not tested |
| 12.21.15 | 1 | 6.75 | 30 | ND | not tested | not tested | 0.638 | 3.2 | 1.22 | 2.47 | not tested |
| 12.21.15 | 3 | 6.75 | 22 | ND | not tested | not tested | 1.38 | 1.69 | 0.88 | 0.176 | not tested |
| 12.21.15 | 4 | 6.5 | 45 | ND | not tested | not tested | 0.476 | 1.76 | 0.982 | 0.181 | not tested |
| 1.5.16 | 1 | 6 | 26 | ND | not tested | not tested | 1.05 | 0.323 | 1.72 | 0.575 | not tested |
| 1.5.16 | 2 | 6.5 | 65 | 1 | not tested | not tested | 2.17 | 0.347 | 2.45 | 0.166 | not tested |
| 1.5.16 | 3 | 6.25 | 50 | 4 | not tested | not tested | 1.29 | 0.756 | 1.61 | 0.181 | not tested |
| 1.5.16 | 2a | 6.25 | 71 | 1 | not | not | 2.19 | 0.251 | 2.25 | 0.211 | not tested |

| | | | | | tested | tested | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.5.16 | 4 | 6 | 11 | 1 | not tested | not tested | 0.867 | 0.256 | 1.06 | 0.104 | not tested |
| 1.5.16 | 5 | 6 | ND | ND | not tested | not tested | 0.151 | 0.535 | 0.235 | 0.148 | not tested |
| 2.17.16 | 1 | 6.25 | 66 | 4 | not tested | not tested | 2.41 | 1.66 | 3.13 | 1.34 | not tested |
| 2.17.16 | 2 | 6.75 | 134 | 4 | not tested | not tested | 3.59 | 2.06 | 3.35 | 0.368 | not tested |
| 2.17.16 | 3 | 6.75 | 50 | 1 | not tested | not tested | 1.03 | 2.79 | 1.28 | 0.386 | not tested |
| 2.17.16 | 2a | 6.75 | 32 | 6 | not tested | not tested | 1.01 | 3.44 | 0.782 | 0.0985 | not tested |
| 2.17.16 | 4 | 6.5 | 80 | 2 | not tested | not tested | 2.15 | 1.38 | 2.29 | 0.274 | not tested |
| 2.17.16 | 5 | 6.75 | 10 | 1 | not tested | not tested | 0.206 | 1.19 | 0.423 | 0.19 | not tested |
| 3.11.16 | 1 | 6.25 | 21 | 1 | not tested | not tested | 0.697 | 0.023 | 1.18 | 0.435 | not tested |
| 3.11.16 | 2 | 6 | 42 | 1 | not tested | not tested | 0.871 | 0.08 | 1.38 | 0.207 | not tested |
| 3.11.16 | 3 | 6 | 24 | ND | not tested | not tested | 0.33 | 0.148 | 0.61 | 0.121 | not tested |
| 3.11.16 | 2a | 6 | ND | ND | not tested | not tested | 0.527 | 0.089 | 0.709 | 0.075 | not tested |
| 3.11.16 | 4 | 6 | 16 | ND | not tested | not tested | 0.695 | 0.175 | 0.507 | 0.118 | not tested |
| 3.11.16 | 5 | 6 | ND | ND | not tested | not tested | 0.146 | 0.122 | 0.296 | 0.140 | not tested |

\* - numbers in red indicate the value reported by PRESS exceeds applicable Effluent Limitations and/or Water Quality Limitations.

103.   Each time the Facility discharges polluted storm water in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V.A. of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time PRESS discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

104.   **Receiving Water Violations**.  Information available to WATERKEEPER indicates that the Facility has failed and continues to fail to comply with the Permit's Receiving Water Limitations and Discharge Prohibitions.  First, the Facility's storm water sampling data summarized above at TABLE 2 demonstrates that discharges contain concentrations of pollutants that cause or contribute to a violation of WQS's established in the Basin Plan and by the CTR.  Although PRESS has failed to analyze each sample for all pollutants associated with its industrial activity, storm water discharged from the Facility exceed the applicable WQS summarized in TABLE 3.

*/ / /*

## TABLE 3

### WATER QUALITY STANDARDS APPLICABLE TO THE FACILITY

| Parameter | Source | Numeric Limit |
|---|---|---|
| pH | Basin Plan | 6.5-8.5 s.u. |
| Al | Basin Plan | 1.0 mg/L |
| Cu | CTR | 0.013 mg/L (Criteria Max Concentration) |
| Zn | CTR | 0.120 mg/L (Criteria Max Concentration) |

105.    Discharges with elevated concentrations of pollutants in storm water from the Facility also violate Receiving Water Limitations that prohibit the discharge of pollutants that adversely impact the environment or human health.  According to the EPA's 2010 303(d) List of Impaired Water Bodies, the Facility's Receiving Waters are impaired for, among other pollutants, lead, pH, copper and zinc.  As demonstrated in TABLE 2, the Facility's discharges contain pollutants at levels exceeding multiple numeric limits set for the protection of the environment and to protect beneficial uses of the Receiving Waters.  Therefore, the Facility's discharges are adversely impacting the environment and causing further impairment of already stressed aquatic systems.  Also, heavy metals like zinc and lead are associated with serious human health problems, including respiratory and reproduction illnesses,

cancer, pancreatic disorders, etc.  These discharges evidence the Facility's adverse impact on the human health of communities that live, work and/or recreate in and around the Receiving Waters in violation of Receiving Water Limitations.

106.    Each violation of the Receiving Water Limitations described above constitutes an independent violation of the Permit's Discharge Prohibition by causing and threating to cause pollution, and contamination of the Receiving Waters.  *See* 1997 Permit, Section A(1); 2015 Permit, Section III(C).

107.    The Permit's Receiving Water Limitations and Discharge Prohibitions are violated each time storm water discharges from the Facility.  Each time the Facility discharges polluted storm water in violation of the Permit's Receiving Water Limitations and Discharge Prohibitions is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time PRESS discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. WATERKEEPER will update the dates of violations when additional information and data become available.

108.    Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

**D.    Defendant's SWPPP and M&RP for the Facility**

109.    On information and belief, WATERKEEPER alleges that PRESS has not developed or implemented, as of March 21, 2017, a legally adequate SWPPP or

COMPLAINT                                                    35

M&RP.

110.   Information available to WATERKEEPER indicates that the Facility has failed to collect and analyze storm water samples as required by the Permit.  For example, only one storm event appears to have been sampled from three discharge points in 2011-2012, while two storm events were sampled in 2012-13, but only from two discharge points.  Furthermore, in 2013-2014 PRESS collected and analyzed zero samples.  In 2014-2015, the Facility collected one sample from four discharge points.  Today, according to the recent data available to WATERKEEPER, PRESS has identified six discharge points from the Facility, but has failed to collect samples from each discharge point during storm events occurring over the 2015-2016 reporting year.  As such, PRESS has been and continues to violate the Permit's sampling requirements.  See 1997 Permit, Section B; 2015 Permit, Section X(B).

111.   PRESS has failed and continues to fail to analyze samples for all parameters required by the Permit.  While PRESS has been diligent in analyzing samples for the basic parameters, the Facility has been inconsistent and deficient in analyzing samples for industry-specific and site-specific parameters.  For example, PRESS failed to analyze a single storm water sample for N+N until the most recent reporting year, during which more than 50% of samples contained concentrations exceeding the Permit's limits.  Further, PRESS reported exceedances of applicable copper limits—by as much as 13 times—in samples taken during the 2011-2012 reporting year, but has ceased testing for copper in all subsequent years.  Despite its

own conclusive sampling evidence to the contrary, the Facility's SWPPP indicates that copper is not a constituent with the potential to be exposed to storm water. Similarly, despite the SWPPP statement that "PRESS specializes in titanium forgings," the Facility has never analyzed a single storm water sample for this pollutant.  Lastly, WATERKEEPER has reason to believe that the Facility uses Chromium in various industrial processes, including in outdoor grinding operations, and that there is a reasonable likelihood that this pollutant is exposed to storm water. However, to WATERKEEPER's knowledge, PRESS has not acknowledged the use of Chromium or analyzed storm water samples for its presence.

112.   Also, the Facility SWPPP only partially develops BMPs for critical pollutant sources and/or develops BMPs that are ineffective.  The SWPPP describes weekly sweeping, the use of leaf blowers to push dust to the center of the yard (for collection) and 'best efforts' to cover materials stored outdoors.  These BMPs are inadequate, and analytical data described in TABLE 2 corroborate their ineffectiveness.  Further, the only BMP in place to address pollutants from the Quench Tanks (another source of the ambiguous pollutant "metals") is "[u]se leaf blowers."  SWPPP at 22.  The use of leaf blowers cannot address overflow and spills from quench tanks. Press must implement robust secondary containment around these known sources of unauthorized non-stormwater discharges.  Similarly, the BMP developed to address dusts, powders and fine particulates also depends on the use of leaf blowers.  WATERKEEPER maintains that the only legally adequate BMPs for

managing dust, powder and fine particulate matter at PRESS are advanced and structural—namely, the performance of any and all grinding activities indoors, or in a contained (not simply covered) structure, with an effective collection system.

113.   On information and belief, WATERKEEPER alleges that PRESS has failed and continues to fail to submit Annual Reports that comply with the Permit's reporting requirements. For example, in each Annual Report since the filing of its 2011-2012 Annual Report, the Facility certified that: (1) a complete Annual Comprehensive Site Compliance Evaluation was done pursuant to the Permit; (2) the SWPPP's BMPs address existing potential pollutant sources and additional BMPs are not needed; and (3) the SWPPP complies with the Storm Water Permit, or will otherwise be revised to achieve compliance.

114.   Information available to WATERKEEPER indicates that these certifications are erroneous. For example, as discussed above, storm water samples collected from the Facility contain concentrations of pollutants above Benchmarks and WQS, thus demonstrating that the SWPPP's BMPs do not adequately address existing potential pollutant sources.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in
Violation of the Permit Effluent Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

115.   WATERKEEPER re-alleges and incorporates all of the preceding

paragraphs as if fully set forth herein.

116.   WATERKEEPER is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

117.   WATERKEEPER is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the Act. *See* 1997 Permit, Effluent Limitation B(3); *see also* 2015 Permit, Section I(D) (Finding 32), Section V(A); *see also* 33 U.S.C. § 1311(b).

118.   Defendant violates and will continue to violate the Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

119.   Each and every violation of the Permit's Effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

120.   Defendant's violations of the Permit's Effluent Limitations and the Act are ongoing and continuous.

121.   By committing the acts and omissions alleged above, PRESS is subject to

an assessment of civil penalties for each and every violation of the Act occurring from March 21, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

122.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

123.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
### Defendant's Discharges of Contaminated Storm Water in Violation of the Permit's Receiving Water Limitations and the Act
### (33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))

124.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

125.   WATERKEEPER is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

126.   WATERKEEPER is informed and believes, and thereon alleges, that

COMPLAINT

40

storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility each time stormwater discharges from the Facility.

127.   Plaintiff is informed and believes, and thereupon alleges, that since at least March 21, 2012, Defendant has discharged polluted storm water from the Facility causing or contributing to the violation of the applicable WQS and that adversely impact human health or the environment in violation of the Receiving Water Limitation of the General Permit.

128.   Every day, since at least March 21, 2012, that Defendant has discharged discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

129.   Each and every violation of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C. § 1311(a).

130.   By committing the acts and omissions alleged above, PRESS is subject to an assessment of civil penalties for each and every violation of the Act occurring from March 21, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

131.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm Plaintiff and the citizens of the State of California, for which WATERKEEPER has no plain, speedy, or adequate remedy at law.

132.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## THIRD CAUSE OF ACTION
**Defendant's Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

133.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

134.   Defendant has not developed and implemented an adequate SWPPP for the Facility.

135.   Each day since March 21, 2012, that Defendant does not develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

136.   Defendant has been in violation of the SWPPP requirements every day since March 21, 2012.  Violation continues each day that an adequate SWPPP for the Facility is not developed and fully implemented.

137.   By committing the acts and omissions alleged above, PRESS is subject to an assessment of civil penalties for each and every violation of the Act occurring from

March 21, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

138.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

139.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendant's Failure to Develop and Implement an
Adequate Monitoring and Reporting Program
(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

140.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

141.   Defendant has not developed and implemented an adequate monitoring and reporting program for the Facility.

142.   Each day since March 21, 2012, that Defendant did not develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and

Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous.

143.    By committing the acts and omissions alleged above, PRESS is subject to an assessment of civil penalties for each and every violation of the Act occurring from March 21, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

144.    An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

145.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Defendant's Failure to Accurately Certify Compliance in Annual Reports in Violation of the Permit and the Act**
**(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

146.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

147.    Defendant has not accurately certified compliance with the General

Permit in each of the annual reports submitted to the Regional Board since at least March 21, 2012.

148.   Each day since at least March 21, 2012, that Defendant does not accurately certify compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendant continues to be in violation of the General Permit's certification requirement each day they maintain an inaccurate certification of its compliance with the General Permit.

149.   By committing the acts and omissions alleged above, PRESS is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 21, 2011 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

150.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm WATERKEEPER has no plain, speedy, or adequate remedy at law.

151.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

COMPLAINT

# RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant(s) to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant(s) from discharging polluted storm water from the Facility unless authorized by the Permit;

c.  Enjoin Defendant(s) from further violating the substantive and procedural requirements of the Permit;

d.  Order Defendant(s) to immediately implement storm water pollution control technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.  Order Defendant(s) to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.  Order Defendant(s) to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.  Order Defendant(s) to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

COMPLAINT

46

h.  Order Defendant(s) to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since March 21, 2012, up to and including November 2, 2015, and up to $51,570 for violations occurring after November 2, 2015 pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.  Order Defendant(s) to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.  Award any such other and further relief, as this Court may deem appropriate.

Dated: _____J/22_____, 2017          Respectfully submitted,

                              By:  _____
                                   Gideon Kracov
                                   Attorneys for Plaintiff